D. S. PENNINGTON, As Trustee in Bankruptcy of Loop Television Company, a Corporation, Plaintiff,

v.

Gerald L. LEFF and H. Gray Whigham, Defendants.

Civ. A. No. 1507.

United States District Court
S. D. Alabama, S. D.

Dec. 31, 1959.

As Amended June 24, 1960.

Arthur J. Kearley and Alvin H. Mc-Connell, of Kearley & McConnell, Mobile, Ala., for plaintiff.

Irvin J. Langford, of Howell, Johnston & Langford, Mobile, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

On June 25, 1953, Loop Television Company, a corporation, filed in this Court its voluntary petition in bankruptcy, and in due course was adjudicated a bankrupt.

The Trustee in Bankruptcy, seeking recovery of alleged voidable preferences from the First National Bank of Mobile, Alabama, and its guarantors, Gerald L. Leff and H. Gray Whigham, filed this action under sections 60, sub. b, 67, sub. e, and 70, sub. e of the Bankruptcy Act (Title 11 U.S.C.A. §§ 96, 107, 110).

The alleged preferences of which the Trustee complains, occurred as a result of certain floor-plan notes issued to the Bank by the bankrupt and guaranteed by Leff and Whigham, who were the principal owners, directors, and officers of the bankrupt. These notes were recorded during the period of four months immediately preceding the filing of the petition in bankruptcy. Payments were made on these notes prior and subsequent to the crucial date preceding bankruptcy. This date has been established to be February 25, 1953. It is the contention of the Trustee that the defendants knew, or should have known, that the bankrupt was insolvent at the time the transfers were made to the Bank.

On March 3, 1953, there was recorded with the Secretary of State for Alabama a statement dated February 24, 1953, which purported to be a statement of trust-receipt financing to cover the floor-plan transactions. This was the only recordation filed with regard to the transaction here in question.

Numerous motions have been filed and argued during the time this case has been on the docket of this Court. Among these motions were those of the defendants for summary judgment on the ground that the various transfers were setoff transactions. On the setoff theory, the motion of the Bank for summary judgment was granted, and that of Leff and Whigham was denied. Their motion for summary judgment was denied because this Court was of the opinion there could be a recovery of preferential transfers against guarantors who were officers of the company and, with knowledge of its insolvency, directed payment to a creditor with the intent of relieving themselves of liability, thus securing a preference for themselves over other creditors of the same class.

With the Bank excluded from this litigation through the Court's order granting its motion for summary judgment, the cause came on for trial without jury, and the Court having heard the evidence and having considered the arguments of counsel, now makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Loop Television Company, a corporation, hereafter referred to as Loop, was incorporated under the laws of Alabama on October 20, 1952. As soon as the company was organized and prepared to commence business, its officers, Leff and Whigham, made application to the First National Bank of Mobile, Alabama, hereafter referred to as the Bank, for the privilege of receiving merchandise under the Bank's floor-plan financing system.[1]

---

1. Under the floor-plan arrangement, it was agreed by the parties that ownership to all merchandise obtained by Loop and placed under the plan would be in the Bank. Custody of the merchandise was retained by Loop. The Bank agreed to lend only 90% of the supplier's invoice price, and Loop was required to pay the remaining 10%. As each new shipment of merchandise was received, Loop would deliver to the Bank the bills of sale, notes evidencing the amount of each loan,

The Bank approved the application and agreed to advance funds to the company under the plan, in order to enable the fledgling company to secure funds sufficient to finance the inventory it would require to operate a successful retail business.

2. Leff and Whigham gave the Bank their personal guarantee in the amount of $75,000 against any loss which the Bank might incur as a result of the floor-plan agreement.

3. At the time the floor-plan agreement was made, Loop opened a checking account with the Bank; and subsequently, in the process of business, the Bank credited amounts to the checking account pursuant to its agreement, and also debited the account by means of debit memoranda for amounts due the Bank by Loop.

4. Twenty floor plans were executed by the parties, amounting to a total of $122,055, during the course of the transactions. Two of these plans were executed after February 25, 1953. However, no recordation of any kind was made until March 3, 1953, at which time the Bank recorded the statement dated February 24, 1953, with the Secretary of State for Alabama.

5. On October 26, 1952, Loop entered into an agreement with the Bank, under the terms of which the Bank was to finance paper acquired by Loop in the retail sale of merchandise, with full recourse against Loop. This agreement was labeled a "Conditional Sales" agreement, and provided that when these contracts were discounted by the Bank, 95% of the collections would go to Loop, and the 5% balance would be credited to a special reserve account and held by the Bank. All amounts so credited were deemed to be pledged by Loop as collateral security for payment by Loop of any liability the Bank might incur as a result of the floor-plan arrangements. Leff and Whigham guaranteed the Bank in the amount of $150,000 against any loss it might incur from the discounting of the conditional sales contracts.[2]

6. Early in 1953, two new television stations went on the air in Mobile. Due to the fact that one of these stations operated on UHF and the other on VHF channels, an additional expense was imposed upon all television retailers in order to supply the existing sets being sold with special converters necessary to receive both channels. There was general over-all customer dissatisfaction, due primarily to broadcasting defects, and retailers were compelled to increase operational costs in order to maintain their goodwill. The existing conditions in the television retail industry during this period may be adequately described as poor in the Mobile area.

7. On January 16, 1953, Loop owed the Bank $73,252 on floor-plan notes. Of this amount, $12,114 was delinquent. By March 20, Loop owed the Bank $54,547, of which amount $17,930 was delinquent. On March 27, Loop paid the Bank $7,000 by check; and between April 1 and April 21, the Bank charged Loop's checking account with $34,079.80 by debit memoranda on floor-plan notes. By May of 1953, the debt due on the floor-plan notes had been liquidated. The amount advanced on the twenty floor-plan notes totaled $122,055. Prior to February 25, 1953, $58,434.50 had been paid to the Bank on the notes. After that date, $63,620.50 was paid. This is the amount the Trustee seeks to recover as a voidable preference.

8. In January of 1953, an audit of Loop's books showed that the company was losing money on its sales. Two experienced accountants audited the company's books in January and subsequent months. The accountant employed by Loop showed the company solvent in late

and trust receipts covering the merchandise entrusted to Loop; the Bank, in turn, would credit Loop's account with 90% of the supplier's invoice price. All merchandise was to be ordered by Loop and delivered to, and paid for, by Loop.

2. Currently, $5,832.27 is being held by the Bank in this account, pending the outcome of this litigation. It is agreed between the parties that the Trustee is entitled to this amount so held.

March of 1953; however, the court-appointed accountant found the company insolvent both during and prior to that time. Although it is true that the audits are inconsistent, both reveal that the company was losing money in its operations as early as January of 1953.

9. During the early part of the year 1953, various suppliers of merchandise had called the defendants and their agent, one Blakely, to advise them that the company was in arrearage on its accounts to them. Loop advised these suppliers that it could not meet its obligations, and instructed the suppliers to come to the store and repossess their merchandise in order to satisfy a portion of the accounts due. Many suppliers did this. A conference was called of all Loop's creditors by the officers of Loop; and its creditors were again instructed that Loop could not meet its financial obligations, and that the suppliers could remove their merchandise to assist in satisfying their debts. The Bank also advised Loop that an inventory, made at the Bank's insistence, revealed that many items of equipment and merchandise had been disposed of without a proper accounting to the Bank.

■ 10. Leff and Whigham were officers and directors of Loop from the date of its inception until it was adjudicated bankrupt. They were also its principal stockholders. From the beginning of 1953, the company was in financial difficulty and this situation grew progressively worse. Each of these defendants testified that if the company was insolvent in the early months of 1953, he had no knowledge of it. Each is a successful businessman in other fields; each has many years of business experience behind him. Weighing this past business experience with the effort made to minimize the indebtedness to the suppliers of Loop by returning merchandise to offset their accounts, the Court is led to the conclusion that if the defendants did not actually know, they certainly had reason to know of the insolvent condition which the company was in during the time here in question.

11. The total amount of claims filed by creditors since the adjudication of bankruptcy amounts to $22,875.59. The Trustee has collected into the bankrupt estate a total of $7,410.82. Assets at the time of bankruptcy amounted to $8,165.61, including the $5,832.37 held by the Bank in the special reserve account. Liabilities of the bankrupt total $17,866.02, exclusive of contingent liability shown on the bankrupt schedule due the Bank and a claim of $50,000 which has been dismissed.

12. The Court finds as a matter of fact that Loop was insolvent prior to and after February 25, 1953, and that Leff and Whigham had reasonable cause to believe Loop insolvent.

### Discussion

The conclusion was reached, when this Court denied the motion for summary judgment filed by Leff and Whigham, that if these officers had knowledge of the insolvency of the company and had proceeded to pay off a creditor in order to absolve themselves of liability as guarantors to said creditor, they could be held liable on the amounts so paid during the four-month period preceding bankruptcy. Kobusch v. Hand, 8 Cir., 1907, 156 F. 660.[3] In the Kobusch decision, the court said:

"It is almost an imperceptible step in advance of this decision, but a logical and reasonable one, to say that where the surety is the president of the bankrupt, and with knowledge of its insolvency directs the payment to the holder of the obligation with intent to relieve himself from liability and to secure an advantage over other creditors, a preference arises which may be recovered from him by the trustee." 156 F. 660 at page 662.

■ The defendants have testified they were without knowledge of Loop's

---

3. To the same effect see also Brown v. Streicher, D.C.R.I.1910, 177 F. 473; In re Schleicher Printing Corporation, 2 Cir., 1933, 62 F.2d 503; Charlesworth v. Levy Meat Co., 8 Cir., 1934, 73 F.2d 953.

insolvency. In order to create a voidable preference under the Bankruptcy Act, it is not necessary that the creditor have actual knowledge of the insolvency.[4] In the case of an ordinary creditor, it has been held on numerous occasions that it is not essential that the creditor have actual knowledge of the debtor's insolvency, because if he has knowledge of facts sufficient to put a prudent man upon inquiry, he is charged with the knowledge of the facts such an inquiry would disclose.[5]

It follows that an officer who is a director and principal stockholder of a corporation should be charged with an even higher degree of responsibility in ascertaining the financial condition of that corporation. A variety of tests have been used by the courts in determining what grounds constitute a reasonable cause to believe that a preference will be effected as a result of a particular transfer. The consensus appears to be that what will constitute a voidable preference will depend on the factual circumstances of each case. All of the facts must be considered in the light of the circumstances existing at the time of the alleged preferential transfer.[6] If the facts reveal circumstances which would put an ordinary prudent businessman upon notice of an existing insolvency, then that party is charged with the knowledge of insolvency, and any transfers of property which occur during such a period must fall when challenged in legal proceedings instigated by the trustee.

In the instant case, the defendants testified that they made daily visits to Loop's business locale; that they conferred daily with the manager regarding the progress of the business; that they occasionally reviewed the company's records; and that they read the profit and loss statement prepared by their accountant. Other evidence showed that they were aware of the company's difficulty in meeting the demands of its creditors; that they advised the suppliers to reclaim some of their merchandise in order to offset the company's indebtedness; and that the Bank called to their attention the company's mounting delinquency on floor-plan notes. Surely these facts more than suffice to charge the defendants with knowledge of an existing insolvency at the time the notes in question were paid. Interpreting these facts from the viewpoint most favorable to the defendants, they were in possession of information sufficient to put a prudent businessman upon inquiry, and therefore are charged with knowledge of facts which would have been disclosed upon inquiry. Probable cause to believe the company insolvent is substantially supported by the evidence.[7]

The defendants have strongly argued that the floor-plan transactions were valid trust-receipt transactions, and therefore they should not be held liable. Having determined that the defendants had knowledge of the bankrupt's insolvency prior to February 25 and March 3, the date the statement of the agreement on the floor plans was recorded, it becomes unnecessary to determine the question of the validity of the floor-plan transactions as trust receipts because, even if they were found to be valid trust receipt transactions, they would be ineffective, since they were recorded during the four-month period prior to adjudication of bankruptcy.

Taking all of these facts into consideration, it is the conclusion of this Court that defendants have acquired preferences within the meaning of section 60 of the Bankruptcy Act (11 U.S.C.A. § 96).[8]

4. Dinkelspiel v. Weaver, D.C.1953, 116 F. Supp. 455.

5. Grant v. National Bank, 1877, 97 U.S. 80, 24 L.Ed. 971; In re Eggert, 7 Cir., 1900, 102 F. 735; Rollins v. Repper, D.C.1947, 69 F.Supp. 976.

6. Harrison v. Merchants National Bank of Fort Smith, Ark., 8 Cir., 1942, 124 F.2d 871.

7. Mizell v. Phillips, 5 Cir., 1957, 240 F.2d 738.

8. Under the Act, section 60, a preference is "a transfer * * * of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or

## Amount of Liability

Trustee claims in his petition the amount of $63,620.50. He claims by way of argument an amount in excess of $70,000. The amount claimed under the conditional sales agreement is available to the Trustee and is being held by the First National Bank of Mobile, Alabama, pending the outcome of this litigation. As of the date of the filing of the bankruptcy petition, this amount totaled $5,832.37.

The amount of $63,620.50 is the amount which the evidence shows was paid by the bankrupt to the Bank on the floor-plan notes after February 25, 1953. A total of $22,875.59 in claims has been filed by creditors in this bankruptcy proceeding. Unfiled claims which appear on the bankruptcy schedule amount to $6,154.43, for a total of $29,030.02 in claims. Thus, the amount claimed by the Trustee exceeds the amount of total outstanding claims, both filed and unfiled, by $34,590.82. If this Court were to give judgment in the amount asked by the Trustee, the total claims would increase to $86,496.09, of which amount the defendants would have a claim of approximately 74%.

Counsel for the defendants argued that if the company had borrowed and paid out the amount of $7,980.29 on the day it was adjudicated bankrupt, it would have paid out 100% on the dollar to all creditors. In the main, this argument is supported by the evidence.[9] It is difficult, therefore, to visualize how in reality the defendants could be liable in the amount claimed by the Trustee.

■■ The benefits of the bankruptcy statutes inure to debtor and creditors, and to the trustee only as he represents the interests of both. No useful purpose would be served in compelling these defendants to pay into the bankrupt estate an amount far in excess of the filed claims and also in excess of the amount which, if paid, would have prevented any necessity of bankruptcy. It is not the

against him of the petition in bankruptcy * * * the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

9. The figure arrived at by the defendants' counsel is based on the following figures which are taken from the bankruptcy schedule and are supported by the evidence:

*Assets* as of June 25, 1953 (date of filing petition in bankruptcy)

| | | |
|---|---:|---:|
| Real assets (office supplies, fixtures, etc.) | | $1,518.00 |
| Held by Bank in special account | | 5,832.37 |
| Accounts receivable (per schedule) | $782.67 | |
| Unexpired insurance | 15.11 | |
| Balance of checking account | 17.46 | 815.24 |
| Total Assets | | $8,165.61 |

| | | |
|---|---:|---:|
| Liabilities as of June 25, 1953 (per schedule) | | $189,117.07 |
| Less: | | |
| Amount owed Bank or contingent liability (no claim) $121,251.05 | | |
| Amount claimed in lawsuit (dismissed) ... 50,000.00 | | $171,251.05 |
| Total Liabilities | | $ 17,866.02 |
| Less Total Assets | | $ 8,165.61 |
| Total Liabilities (Net) | | $ 9,700.41 |
| Less Unfiled Claims owing by Loop to defendant Leff | | 260.12 |
| | | $ 9,440.29 |

purpose of bankruptcy proceedings to punish, but to see that substantial justice is granted to all creditors. Upon this reasoning, the amount of $9,440.29 appears to the court to be a fair one. Therefore, this is the amount, plus interest, the Trustee shall be granted in this case. It follows in the line of reasoning which has been expressed herein that the defendants, Leff and Whigham, shall be prohibited from filing a claim against the bankrupt estate of Loop Television Company for the amount so paid by them in discharge of their liability. This is not to say that a similar result will be reached in every case of this nature, but based upon the facts as evidenced by this particular case, the result reached appears to be a logical and reasonable one.

### Conclusions of Law

#### I.

This Court has jurisdiction of this case. Title 28 U.S.C.A. § 1334.

#### II.

■ Where, as here, officers of an insolvent corporation make preferential transfers to a creditor of the corporation in order to absolve themselves of personal liability on their personal guaranty, and at the time of said transfers, they had actual or constructive knowledge of insolvency, such preferential transfers should be voided. And where the creditor is entitled to valid setoffs on the transfers, the officers will be held liable on their guaranty.

#### III.

When circumstances, as revealed by the evidence, indicate the amount claimed by the trustee to be impractical, the Court will endeavor, on the basis of logic and reason, to determine an amount of liability which is just and fair to all the parties involved. From the above, it follows that the plaintiff should have judgment against the defendants in the amount of $9,440.29 plus interest at the rate of 6% per annum from June 25, 1953, together with costs and that the defendants should be prohibited from filing a claim against the bankrupt estate of Loop Television Company for the amount to be paid by them under this decision.

Judgment in accordance herewith will forthwith issue.