In the Matter of O.L. ISBELL, Naomi Kay Isbell, and Isbell Chevrolet, Inc., Debtors.

James F.B. DANIELS, Trustee in Bankruptcy, Plaintiff,

v.

THORNTON BANK OF NEVADA, Bank of Carthage, and Bank of Harwood, Defendants.

Bankruptcy Nos. 81–01444–SW, 81–01445–SW.
Adv. No. 82–0071–SW.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Sept. 16, 1982.

James F.B. Daniels, trustee.

James R. Bickel, Nevada, Mo., for Thornton Bank of Nevada.

J. Kevin Checkett, Carthage, Mo., for Bank of Carthage.

Nicholas Swischer, Nevada, Mo., for Bank of Harwood.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT FOR THE PLAINTIFF AND AGAINST THE DEFENDANT THORNTON BANK IN THE SUM OF $41,006.64; FOR THE PLAINTIFF DANIELS AND AGAINST THE DEFENDANT BANK OF CARTHAGE IN THE SUM OF $23,918.38; AND FOR THE DEFENDANT BANK OF HARWOOD ON THE PLAINTIFF'S CLAIM AGAINST IT

DENNIS J. STEWART, Bankruptcy Judge.

The plaintiff trustee in bankruptcy has filed these separate claims sounding in preference and fraudulent conveyance [1] against

---

**1.** The claim against the defendant Thornton Bank of Nevada contains the following material allegations:

"That within 90 days prior to the of the Creditors' Involuntary Petition in Bankruptcy certain transfers and transactions took place between the debtors herein and defendants herein, the Thornton Bank of Nevada, Missouri; the Carthage Bank, Carthage, Missouri.

"The debtors herein, prior to February 1, 1981, were engaged in a scheme commonly known as check 'kiting' wherein the debtors would deposit checks to one or more of Defendant banks with checks drawn on the debtors' accounts in other banks in which debtors did not have sufficient funds; that, prior to February 1, 1981, one or more of the defendant banks discovered the scheme of Debtors and began refusing to allow the Debtors to draw money on checks written by Debtors against uncollected funds; that as a result, the Debtors' checks in the amount of over $80,000 were not paid by the Defendant banks.

"That one or more of the Defendants became aware of the check kiting scheme of Debtors and, as a result, the Defendants Bank of Carthage and Thornton Bank caused the Debtors to execute certain promissory notes and to assign certain security interests to them to secure the said Defendants' losses on checks which they (the said Defendants) had paid for Debtors, but on which said Defendants had not received funds:

(A) That on or about the 5th day of February, 1981, the Debtors O.L. Isbell and Naomi Kay Isbell executed a certain deed of trust conveying a security interest in land owned by Debtors to the Bank of Carthage securing the amount paid by the Bank of Carthage on bad checks written by Debtor . . .

(B) That on or about the 5th day of February, 1981, the Debtors . . . executed a certain

the three above-named plaintiffs. The actions have been separately tried by the court sitting without a jury on the dates of February 26, 1982, and March 26, 1982. The evidence then taken warrants the following findings of fact in respect of the respective defendants.

## I

### Thornton Bank of Nevada

■ The debtors, as the result of a check-kiting scheme engaged in prior to the date of the inception of these involuntary chapter 7 proceedings, built up deficits in the accounts of the debtor Isbell Chevrolet, Inc.,

deed of trust conveying a security interest in land owned by Debtors to the Thornton Bank securing the amount paid by the Thornton Bank on bad checks written by Debtors . . .
(C) That on or about the 6th day of February, 1981, the Debtors . . . executed a certain deed of trust conveying a security interest in land owned by said Debtors to the Bank of Carthage securing the amount paid by the Bank of Carthage on bad checks written by said Debtors . . .
"That, thereafter, on the 30th day of March, 1981, the Debtors . . . sold and conveyed by warranty deed the real estate described (in the above transactions) to Clifford Tong and MaDonna Tong . . . and that the proceeds of the sale of the real estate were distributed in whole or in part to the Defendant Bank of Carthage and the Defendant Thornton Bank."
The claim against the Bank of Carthage contains the same material allegations.
The claim against the Bank of Harwood contains the following material allegations:
"That plaintiff incorporates herein by reference paragraphs '1', '2' . . . of (material allegations in regard to Thornton Bank and Bank of Carthage).
"That the Defendant Bank of Harwood paid certain checks of the Debtors without the Debtors having the funds deposited in the Bank of Harwood to cover said checks; that upon the Bank of Harwood discovering the check kiting scheme of Debtors, the said Bank continued to accept regular actual deposits from the Debtors and applied said funds to cover the checks previously paid by said Defendant Bank, refusing, however, to pay checks written by Debtors on said bank, so that the said Defendant Bank of Harwood was permitted to cover its losses.
"That the actions of the Defendant Bank of Harwood allowed the said Bank of Harwood to collect and retain monies for antecedent debts owed by Debtors before such transfers

at the Thornton Bank of Nevada, Missouri, and at least one other bank. The deficit which had been built up in the account of Isbell Chevrolet, Inc. with the Thornton Bank was in the amount of $41,006.64. When the practices resulted in the deficits, the debtors O.L. and Naomi Isbell requested a loan from the Thornton Bank of Nevada with which to pay those deficits. On February 5, 1981, a date within 90 days of the commencement of this title 11 case, the loan was granted to the Isbells in the sum of $80,000.00. The defendant Thornton Bank of Nevada was granted a security interest in certain real property of the Isbells as security for repayment of the loan.[2] The

were made; that the Bank of Harwood's actions occurred while the Debtors were insolvent; that the transfers were to and for the benefit of the Defendant Bank of Harwood; that the actions of the Defendant Bank of Harwood enabled Defendant Bank of Harwood to receive more money than the said Defendant Bank of Harwood would have received had the said Defendant Bank of Harwood *not* withheld payment of checks drawn by Debtors on said bank; and that such transfers were made on or within 90 days before the date of filing of the involuntary petition in bankruptcy or within one year before the date of filing of the petition and made to the Bank of Harwood which was an insider who had reasonable cause to believe the Debtors were insolvent at the time of said transfers."

2. The security interest was granted on February 5, 1981, *in the following described property:*
"All of Lot Five (5) of Sandstone Hills Subdivision to Cedar County, subject to prior encumbrances to First Savings and Loan Association.
"All of the Northwest Quarter of the Northeast Quarter; and All of the Southwest Quarter of the Northeast Quarter; and All that part of the Northeast Quarter of the Northeast Quarter lying on the South side of Spring River in Section 18; and
"All of the Southwest Quarter of the Southeast Quarter lying South of Spring River; and All that part of the Southeast Quarter of the Southeast Quarter lying South of Spring River in Section 7; and
"All that part of the Northwest Quarter of the Northwest Quarter lying South of Spring River in Section 17, all being in Township 29, Range 32, in Jasper County, Missouri EXCEPTING any and all road rights-of-way, subject to prior encumbrances to Farm and Home Savings Association, Ozark Production

evidence is clear and uncontradicted, however, that the real property thus given as security was of a value which was insufficient to result in the realization of any value over the pre-existing liens.[3] Accordingly, Thornton Bank of Nevada, according to the uncontradicted evidence, realized no value from the ultimate sale of this real property.[4] Therefore, no recovery can be had by the trustee on account of any preference conferred by means of the taking of the security interest in real property within 90 days of the commencement of these title 11 proceedings.

■ The Isbells, however, used, as noted above, $41,006.64 of the proceeds of the loan to pay the antecedent debt of Isbell Chevrolet, Inc., to the Thornton Bank of Nevada. This was certainly a transfer of value by the debtors to a creditor of Isbell Chevrolet, Inc., on account of an antecedent debt within 90 days of bankruptcy at a time when the debtors were presumed to be insolvent.[5] The defendant argues, however, that the transfer cannot be regarded as being on account of an antecedent debt *of the debtors* because it went to pay off an antecedent debt of their corporation, Isbell Chevrolet, Inc. But there is no equivocation in the record before this court to the effect that the Isbells were corporate officers of Isbell Chevrolet, Inc. Traditionally, the case decisions have equated corporations and their officers in determining whose antecedent debt was paid.[6] In determining the exist-

ence of a preferential transfer, a bankruptcy court, as a court of equity, must "look ... through form to substance, .... [and] treat the transaction according to its real nature." *Katz v. First National Bank of Glen Head,* 568 F.2d 964, 970 (2d Cir.1978). The parties to a transaction cannot, by using the individual debtors to make the payment on behalf of the corporate debtor which could only act by and through them, prevent through technicality and a thin disguise this preference from being reckoned as such.

But, even if form is to be exalted over substance, the undisputable fact that Isbell Chevrolet, Inc., is also a debtor in these title 11 proceedings, still makes the transfer preferential. For the transfer of the $41,-006.64 from the Isbells to the Thornton Bank on behalf of Isbell Chevrolet, Inc., must necessarily be regarded as having passed through the Isbell Chevrolet, Inc. account with the bank. Thus, it must properly be regarded as a transfer from the debtor Isbell Chevrolet, Inc., to the Thornton Bank of Nevada within 90 days of bankruptcy. Accordingly, the plaintiff, who is trustee in bankruptcy for Isbell Chevrolet, Inc., as well as O.L. and Naomi Isbell, may recover this preferential transfer.

But, alternatively, even if, as the bank maintains, the transaction must simply be regarded as a transfer from the Isbells to

---

Credit Association, Frank Phillips, and the Bank of Carthage."

3. According to the evidence, the value of the property established by the uncontradicted evidence in this case to have had no value above and beyond the balances due on the security interests against it. According to the uncontradicted testimony of Darrell Myer, rendered in the course of the hearing of this action, the eventual sale of the property did not result in any value to the bank. According to the testimony of Mr. Myer, the value of the property was not as great as the balances due on the encumbrances against it.

4. The liens adverted to in note 3, *supra,* were antecedent and prior to that conveyed to the Thornton Bank of Nevada.

5. See section 547(f) of the Bankruptcy Code providing, as follows, that, if no evidence is offered on the subject, the debtor is presumed

to be insolvent at the time of a transfer within the 90-day period next preceding bankruptcy: "For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."

6. See, e.g., *Pennington v. Leff,* 183 F.Supp. 884, 891 (S.D.Ala.1959), to the effect that, when corporate officers cause the corporation to make payments to absolve the corporate officers of personal liability, and the other requirements of a preference are met, the payments may be voided as preferential. The converse must necessarily be true. When the debtors made payments on behalf of Isbell Chevrolet, Inc., they must be deemed to have paid the money initially to the corporation, who then paid the money to the bank.

the Thornton Bank of Nevada and therefore not on account of any debt owed by the Isbells to the transferee bank, it must be regarded as a transfer for inadequate consideration within the meaning of § 548(a)(2) of the Bankruptcy Code. See, e.g., *Davis v. Cook Construction Co.*, 649 F.2d 613, 615 (8th Cir.1981) ("... transfers to pay another's debt are not made for 'fair consideration.'"). The defendant does not contend that the debtors were solvent at the time of the transfer.[7] Therefore, under such a view of a transfer, the plaintiff trustee must be regarded as entitled to avoid it as a transfer within a year of bankruptcy while insolvent and for inadequate consideration within the meaning of § 548(a)(2), *supra*.[8]

For the foregoing reasons, the plaintiff trustee must be regarded as entitled to

**7.** No evidence was offered to show insolvency at the time of the challenged transfer. Cf. note 5, *supra*.

**8.** The governing statute provides as follows: "The trustee may avoid any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor ... made such transfer with actual intent to hinder, delay, or defraud any entity ... or was insolvent on the date that such transfer was made ... (and received less than a reasonably equivalent value in exchange for such transfer or obligation)." *Apart from the findings and conclusions contained in the text of this memorandum, it is further found by the court that the transfer was made with actual intent to hinder, delay, and defraud creditors by use of this stratagem of having the corporate debt paid by the individual debtors.*

**9.** According to the court's review of the evidence, it is unequivocal to this effect.

**10.** Other evidence of a real property transaction was adduced at the trial of this action and extensively briefed. But, according to the evidence produced, that transaction cannot be regarded as any kind of a voidable transfer. The challenged transaction is accurately described as follows in the posttrial brief which was submitted by the defendant Bank of Carthage:

"The Debtors, Mr. and Mrs. O.L. Isbell, became customers of the Bank of Carthage in November 1980 and soon thereafter obtained a loan from the Bank of Carthage. On the 4th day of December 1980, the debtors executed a promissory note with the Bank of Carthage which was secured by a deed of

recover the sum of $41,006.64 from the defendant Thornton Bank of Nevada.

## II

### Bank of Carthage

A portion of the proceeds of the loan obtained from the Thornton Bank of Nevada, some $23,918.38, was paid over to that bank to cover the deficit created in the account in that bank by the check-kiting scheme.[9] Therefore, for the reasons stated above, that transfer must be regarded as avoidable by the plaintiff trustee in bankruptcy and the sum of $23,918.38 accordingly turned over to him by the defendant Bank of Carthage. Other prebankruptcy transactions between the debtors and the Bank of Carthage are not shown to be avoidable by the trustee.[10]

trust on the Debtors' home ... The intent at that time was for the Bank of Carthage to take a deed of trust against the farmland adjacent to the home and not on the home itself. However, when the title insurance policy was issued by the Jasper County Title Company, the legal description contained the home as well as the farmland. In an attempt to correct the legal description a section was added to it which inadvertently excepted from the legal description the house and therefore the security obtained by the Bank of Carthage was the house itself and not the farmland. The executing of this promissory note and deed of trust had nothing to do with the check kiting activity of Debtor corporation or the losses received by the Bank of Carthage as a result of the check kiting. Rather, the loan was to provide the Debtors with operating capital for their business. As a result of taking the deed of trust against the home, the Bank of Carthage held a third deed of trust subordinate to Farm & Home Savings Association and Mr. and Mrs. Frank Phillips.

"On or about January 28, 1981, the Bank of Carthage discovered (that) the Debtors were kiting checks from their Bank of Carthage account. The Bank of Carthage suffered a loss as a result of the check kites in the amount of $23,918.38.

"On the 5th day of February, 1981, the Debtors executed a promissory note in the amount of $80,000.00 in favor of Thornton Bank. Thornton Bank advanced the sum of $64,925.02 toward the promissory note. As security the Thornton Bank took a deed of trust against the farm and the house owned

## Bank of Harwood

According to the facts stipulated by the parties in this case, the setoff which was exercised by the Bank of · Harwood within 90 days of the inception of these title 11 proceedings was wholly to the use and benefit of the Small Business Administration except the sum of $7,353.46.[11] The stipulated facts demonstrate that the bank's position had not been improved to this point and, therefore, no recovery by the trustee is therefore possible.[12]

by Mr. and Mrs. Isbell. This action had the effect of giving Thornton Bank a fourth deed of trust on the house and a second deed of trust after Ozark Production Credit on the farm. At the time Thornton Bank obtained the deed of trust on the farm and house, they discovered that the Bank of Carthage had filed their deed of trust on the wrong tract of real property.

"On February 6, 1981, a discussion ensued between the Debtors Isbell and the Bank of Carthage. It was agreed that in consideration for the Bank of Carthage to release the deed of trust on the house ... the Bank of Carthage would obtain a deed of trust on the farm as was originally contemplated by the parties ... No new promissory note was executed but rather the December 4, 1980 promissory note remained in effect with the security for that note simply being transferred contemporaneously. The new deed of trust on the farm and the release of the deed of trust on the house were exchanged simultaneously for the purpose of remedying the error made in December 1980 .... (T)he exchange of security on February 6, 1981, by the Bank of Carthage of the home for the farm was academic and done only in good faith by the Bank of Carthage in an effort to place it in the original security position contemplated ..."

Thus, according to the evidence adduced in the hearing of this action, this transaction did not constitute a transfer within the meaning of section 547 but was really simply a correction of the existing records to demonstrate what had happened in December of 1980.

11. According to the oral stipulation entered into between the plaintiff trustee and the Bank of Harwod, the matter was submitted on substantially the following facts:

(1) On January 31, 1981, the date which marked the beginning of the 90-day period next preceding bankruptcy, Isbell Chevrolet, Inc., had a balance in its account at the Bank of Harwood in the sum of $145,352.12.

(2) A substantial amount of the sum then on deposit represented uncollected funds, deposits which the debtor had made by means of checks dishonored by other banks. Between January 31, 1981, and February 12, 1981, the Bank of Harwood set off on account of these dishonored checks a sum of $141,658.16.

(3) Consequently, the balance in the account of Isbell Chevrolet, Inc., at the Bank of Harwood as of February 12, 1981, had been reduced to $12,743.96.

(4) As of that date, the debtor Isbell Chevrolet, Inc., had an indebtedness due and owing to the Bank of Harwood in the sum of $151,646.14. That indebtedness was guaranteed by the Small Business Administration.

(5) Subsequently, after the abovementioned indebtedness had long been in default, on April 14, 1981, the Bank of Harwood, at the instance of the Small Business Administration, set off the $12,743.96 balance against the existing indebtedness.

(6) The $12,743.96 thus taken from the account of the debtor Isbell Chevrolet, Inc., was applied as follows:

(a) As accrued interest due to the Bank of Harwood .... $6,754.52

(b) Applied to principal .... $5,989.54 (Of this amount, the Bank of Harwood, according to the stipulation between the parties, received only the sum of $598.94).

(7) The first insufficiency in the account of the Bank of Harwood was the sum of $5294.02 on the date abovementioned, January 31, 1981.

12. Under the governing provisions of section 553(b)(1) of the Bankruptcy Code, "if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of (A) 90 days before the date of the filing of the petition and (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency." According to the facts above stipulated, from the $12,743.96 taken by means of the setoff, the sum of $7353.46 went to the Bank of Harwood. (Although the parties appear to stipulate that the interest was actually paid to the bank by the Small Business Administration, the court must look through form to substance and see that in reality it was paid from the debtor's account.) Under the above quoted statute, " 'insufficiency' means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim." Section 553(b)(2) of the Bankruptcy Code. From the facts stipulated, the insufficiency at the inception of the ninety day period was $5294.02. On the date of the setoff, it was vastly more than that.

240

For the foregoing reasons, it is hereby

ADJUDGED that the plaintiff trustee in bankruptcy have and recover from the defendant Thornton Bank of Nevada the sum of $41,006.64. It is further

ADJUDGED that the plaintiff trustee in bankruptcy have and recover from the defendant Bank of Carthage the sum of $23,918.38. And it is further

ADJUDGED that judgment be, and it is hereby, entered in favor of the defendant Bank of Harwood on the plaintiff trustee's claim against it.